JUDGE SEIBEL

**UNITED STATES DISTRICT COURT,**

**SOUTHERN DISTRICT OF NEW YORK**

20 CV 00560

| | |
|---|---|
| SATISH DESHPANDE, M.D. <u>PLAINTIFF</u>. | )  CIVIL. |
| | ) |
| | )  CASE NO. |
| **AGAINST** | ) |
| | ) |
| | )  JURY TRIAL |
| METHODIST HOSPITAL OF | )  DEMANDED |
|     SOUTHERN CALIFORNIA, | ) |
| BALA CHANDRASEKHAR, M.D. | ) |
|     INDIVIDUALLY AND AS | ) |
|     AN AIDER AND ABETTOR, | ) |
| JACOB FAKOORY, M.D, | ) |
|     INDIVIDUALLY AND AS | ) |
|     AN AIDER AND ABETTOR. | ) |
| <u>DEFENDANTS</u>. | ) |

Plaintiff, Satish Deshpande, MD, Pro Se alleges as follows:

## I. INTRODUCTION

1. This is an action to vindicate the employment and civil rights of Plaintiff. Plaintiff contends that defendants altered the terms, conditions and privileges of his employment on account of his race, and because of

1

his reasonable and good faith complains about discrimination. All of these illegal activities against the Plaintiff took place between the time period from about December 2013 and October 2018.

## II. JURISDICTION

2. This Court's jurisdiction for this action is invoked under U.S.C, Title 42, Subchapter VI, especially Sections 2000 (e)-2, 2000(e)-3 and U.S.C, Title 42, Subchapter I, Section 1981. Additional jurisdiction is invoked under 28 U.S.C. § 1332, Diversity of Citizenship. Moreover, Venue is proper as the Plaintiff's permanent residence is in the jurisdiction of the Southern District of New York and within whose jurisdiction the Plaintiff suffered the ill effects of termination of his service, the most.

## III. PARTIES.

3. Satish Deshpande, M.D.,(hereafter "Plaintiff"), who is domiciled and who resides in the Westchester county, at New York at 28 Nelson Rd., Scarsdale, NY 10583, alleges on his own behalf that at all relevant times he was employed with the Defendants as an Attending Physician with the title of Hospitalist. He was assigned to the Methodist Hospital of Southern California by his sponsor, Benchmark Hospitalist Group (hereafter "Benchmark"). Plaintiff is a Citizen of the State of New York.

2

4.  Methodist Hospital of Southern California, Dr. Jacob Fakoory, M.D, and Dr. Bala Chandrasekhar M.D, (hereafter "Defendants") collectively employed the Plaintiff at all relevant times as an Attending Physician and as a Hospitalist. Defendants acted individually and collectively in violating the protected employment rights of the Plaintiff. Defendants' addresses are as below: 300 West Huntington Dr., Arcadia, CA 91007.

.

5. Individual defendants Dr. Bala Chandrasekhara (hereafter "Chandrasekhar") and Dr. Jacob Fakoory, M.D.,(hereafter "Fakoory") at all relevant times directly participated in the illegal acts complained herein and at all relevant times, aided and abetted the discriminatory and retaliatory acts towards the Plaintiff. Each individual defendant at all relevant times was employed and/or associated with the Methodist Hospital of Southern California (hereafter "Hospital"). Defendant Hospital is incorporated in the State of California, while both Chandrasekhar and Fakoory are Citizens of the State of California.

## IV. ALLEGATIONS

6. Plaintiff, Satish Deshpande, alleges that during his employment at Methodist Hospital of Southern California, he was discriminated because

3

of his nonwhite race and when he complained about it, he was retaliated with termination of his service.

7. Plaintiff avers to the following:

8. Plaintiff is a Physician licensed by the state of California, specialized in the field of Internal Medicine, an Indian by birth and has identified himself as of "Asian" Race.

9. The Plaintiff at all relevant times was a physician employed by the Hospital, Methodist Hospital of Southern California, located at 300 W Huntington Drive, Arcadia, CA 91007, from December 2013, through a sponsor, Benchmark who specializes in providing physician services to the Hospital. The Plaintiff's work at the Hospital started on or about December of 2013. The Hospital is a Corporation incorporated in the state of California.

10. During his employment at the Hospital, the Plaintiff observed, perceived and felt that the Physicians of White race in the Hospital were treated favorably and differently from him, who was nonwhite. The Plaintiff complained about it to the Hospital Executives but to no avail. Ultimately, the Plaintiff's services were terminated on or about November 01, 2018.

4

## V. PLAINTIFF WAS AN EMPLOYEE AND HOSPITAL WAS HIS EMPLOYER.

11. The Plaintiff was privileged by the Hospital to perform his duties as a physician in the Hospital, without which privileges, he could not have practiced the medical profession at the Hospital. Granting of such privileges by the Hospital was through a rigorous, heavily scrutinized and vetted process of credentialing and was conditioned upon providing the standard of care to the patients belonging only to his specialty. Plaintiff at all relevant times, specialized in Internal Medicine only and the full scope and limitation of his practice at the Hospital was clearly delineated by the privileges that he was granted.

12. The Hospital dictated the work hours, location of work, para meters for the Plaintiff's work and provided necessary tools, staff, workspace, and support services. The Hospital also demanded Plaintiff's interaction with and accountability to non physician employees of the Hospital. The Hospital provided even cookbook medicine templates to the Plaintiff and insisted that he should use those templates while ordering tests and medicines to the patients. The Plaintiff could not have hired an assistant on his own, changed his work hours or location, or worked remotely. But he was engaged in the same business as that of Hospital.

5

13. The Hospital additionally mandated that the Plaintiff participate in some other activities even though they were not necessary for providing the standard of care to the patients. Many of these activities were meant purely for sustaining, promoting and advancing solely the business purpose of the hospital. The Hospital, through its Physician and non physician employees controlled the admitting, discharging and consulting activities of the Plaintiff. Literally the Plaintiff could not have practiced Medicine independently while providing care to the patients who, in turn, were also assigned to him by the Hospital.

14. The Hospital's control over the means and manner of the Plaintiff's functioning, thus, was expansive, exhaustive, and nearly unlimited. The control of the Plaintiffs employment activities by the Hospital was on a close, constant and continuous basis. The Hospital had taken away all the independence of the Plaintiff's professional activity. Additionally, the Policy Manual of the Hospital and the Bylaws of the medical staff of the Hospital together had essentially converted the Plaintiff's employment into one of near paid slavery.

15. This Byzantine and dictatorial control of the Plaintiff by the Hospital was achieved mainly through some of the employees and contractors of the Hospital (hereafter "Agents"), the prominent amongst them being

Chandrasekhar, who is also the Chief Medical Officer of the Hospital and Fakoory, who is the Director of the Emergency Department of the Hospital. Thus, the Hospital and the Plaintiff had a clearly established Employer-Employee relationship at all relevant times.

## VI. DUTIES OF THE PLAINTIFF.

16. The Plaintiff's main job was to admit patients from the Emergency Department to the Department of Medicine only, provide Consultation in Internal Medicine only to other specialties and provide cross coverage to the inpatient medical service patients, belonging to Benchmark, whose overwhelming majority (90%) of similarly situated physicians were Non Whites, females and Minorities.

17. The Plaintiff at all relevant times had specialized in Internal Medicine only and had no postgraduate training either in Surgery or Gynecology or Neurosurgery, Urology, Plastic Surgery or ENT field. The scope of his practice dictated by his specialty, license and the Hospital privileges was unmistakably limited only to Internal Medicine.

18. The Hospital has several other specialty physicians on its Medical Staff for providing specialty care to the patients as needed. These

7

specialties include General Surgery, Neurosurgery, OB/GYN, Orthopedics, Plastic Surgery and Urology among others. The specialty physicians belonging to these specialties are also privileged to admit and care for their patients in the exact manner in which the Plaintiff was also privileged. These specialty Physicians are trained in their own specialty so that they can provide at least the standard of care to those patients whose chief medical problem could best be handled by that particular specialty. Most of the specialties' Physicians are whites. Some of these white specialists are Dr. Robert Papadapoulous, Dr. John Tyrell and Dr. Carbosierro of Surgery, Dr. John Quigley and Dr. Criswell of Orthopedics, Dr.Alan Schlearth of Gynaecology and Dr.Gregory Withers of Neurosurgery.

19. The Hospital Policy Manual clearly establishes that ALL PRIVILEGED physicians, irrespective of the specialty, must so practice that each Physician meets at least the standard of care owed to the patients, independently. This includes admitting, caring for and discharging patients belonging to one's own specialty. It further clarifies that the patient should be admitted to the service which is capable of and which can provide the best care to the patient who is need of such care whenever he/she came to the emergency room and when he/she is being admitted for.

20. As a standard and routine practice, the Medical Necessity of an Admission is decided by the Emergency Department Physician who must identify the chief medical problem for which patient is being admitted for. It is a professional obligation on the part of the Emergency Department Physician to establish that the patient's most needy and serious medical condition is identified as the chief problem of the patient and thereby, the patient's admission is assigned to the service that has the capability to treat that chief problem. In other words, it is a logical and a prudent professional practice to admit a patient with chief Surgical problem( like Appendicitis) to a Surgeon, chief Gynecological problem ( like Cancer of Ovary ) to a Gynecologist, chief Neurosurgical problem ( like brain Hemorrhage) to a Neuro surgeon and chief Internal Medicine problem( like Pneumonia) to an Internist, specialized in Internal Medicine. The noble idea behind such professional practice is to insure that each patient gets the best care that he/she needs from the appropriate Physician.  Such a noble concept has been enshrined in the Bylaws of the Hospital.

## VII. RACIAL DIFFERENCES IN WORK DISTRIBUTION

21. However, during his work tenure at the Hospital the Plaintiff noticed on an ongoing basis that such a noble professional standard was neither practiced nor met at the Emergency Department headed by defendant Fakoory. The Hospital through its Agents Chandrasekhar and Fakoory

9

had established a different pattern for admissions in the Emergency Department. It dictated that the patients with Surgical, Orthopedics, Urology, ENT, and Gynecological problems (collectively called Surgical patients) were to be admitted by the Plaintiff as Attending of Record, even though Plaintiff did not have any training in those fields. Under this arrangement the Plaintiff was mandated by the Agents of the Hospital on a routine basis to admit, care for and take up all responsibility for patients who did not belong to his specialty. This arrangement relieved the Surgeon, Orthopedist, Gynecologist, Neurosurgeon, Oto laryngologist, who all had admitting privileges, from the responsibility of admitting these patients.

22. However, these Surgical patients, whose primary medical problems, could best be handled only by the Specialists, should have been admitted by the specialist in that field to his own service, to meet the standard of care. This is precisely the reason why Hospital had granted Full Privileges to the Surgeons, Urologists, Gynecologist, Plastic surgeon, and Orthopedist named above, which privileges clearly included the authority and professional obligation to admit, perform History and Physicals on admission, care for the patient as Attending of Record and  discharge the patients as and when appropriate.

23. Moreover, often these surgical specialists did not come to see the patients in emergency room, and were only peripherally involved in the patient's care while insisting that the Plaintiff should take care of those patients. This Master and Servant relationship between white specialist and the non-white Plaintiff was intentionally created by the Hospital through its Agents so that the White Specialists were made comfortable and kept happy at the expense of the Non white Plaintiff and similarly situated minority Physicians. Most importantly this arrangement denied the standard of care owed to those Surgical patients.

24. Examples of such abnormal and dangerous admitting practices abound but for the purposes of pleading a few following examples are mentioned. Patients admitted by the Plaintiff because of Hospital's insistence, even though these patients chief problems were "Surgical" and not "Internal Medicine"

a. Diagnosis of Patellar Fracture, on 06/15/2018, attended to later on and only consulted by Dr. Criswell of Orthopedics

b. Diagnosis of Perforated Viscus, on 09/25/2017, later on operated upon by Dr. Alexander of General Surgery.

c. Diagnosis of Small Bowel Obstruction with MR # .....921, later on cared for by Dr. John Tyrrell of General Surgery.

d.   Diagnosis of Ureteric obstruction by stone, on 05/08/2018, attended to later on and only consulted by Urologist Dr. Yamada

25. A routine objection to such a practice was raised by several nonwhite physicians of Benchmark but fell on deaf ears. However defendants Chandrasekhar and Fakoory had instructed Emergency Department physicians to follow this aberrant admitting pattern. Ironically, many Emergency Department Physicians acknowledged privately their dissatisfaction with this arrangements, as they too felt it was improper, but were directed to do so.

26. Astonishingly, defendants Chandrasekhar and Fakoory never insisted that surgical patients belonging to Non White Surgeons, should be admitted by the Plaintiff (and other nonwhite Physicians of the group). Those nonwhite surgeons, unlike other White Surgeons, mostly admitted their patients themselves and cared for and discharged them, thereby meeting their professional obligation fully.

27. A similar racial divide was clearly seen even in discharging patients from the Emergency Department, whenever White specialists after a consultation, opined that no admission to the Hospital was necessary. Under such circumstances, the Emergency Department Physician took the responsibility upon himself/herself to discharge those patients. But the

12

same Emergency Department Physician refused to take responsibility to discharge a medical patient belonging to the Plaintiff (or other nonwhite Physicians), whenever a decision was made by the Plaintiff and other nonwhite physicians that admission to Hospital was not necessary. Under those circumstances defendant Fakoory insisted that the Plaintiff (and other nonwhite physician) had to discharge the patient himself. Thus, once again a two tier racial system was put in place and operated by defendants Chandrasekhar and Fakoory. This practice of racial favoritism occurred on a daily basis. The Plaintiff, throughout his tenure voiced his opposition and objected to this admitting and discharging practice of the Hospital, whenever he had discussions, with the Agents of the Hospital.

28. On or about the summer of 2016, defendant Chandrasekhar summoned the Plaintiff to his office and admonished the Plaintiff for "making the Emergency Department and Specialty Physicians uncomfortable" by offering resistance to admission. Defendant Chandrasekhar could neither give an explanation for what did he mean by "making them uncomfortable" nor gave any one specific patient example to substantiate his allegation. However, he counseled the Plaintiff, in response to Plaintiff's objection to racial favoritism as the root cause, that "one being a minority one has to accept such an arrangement."

29. A few months later defendant Fakoory summoned the Plaintiff to his office and threatened the Plaintiff that there were many Emergency

13

Department physicians who felt the resistance from the Plaintiff in admitting patients and that if he wanted to continue to work there he had to admit any patient that was assigned to him or discharge himself. When Plaintiff tried to offer an explanation about surgical patients, for whom he could not offer the standard of care, defendant Fakoory stated that the Plaintiff has to take care of the "old white Boys club", obviously referring to senior white surgeons.

30. A time came when the Plaintiff noticed that some of the white physicians notably Dr. Mucia, in the emergency department did not provide the standard of care to the patients. The Plaintiff brought this to the attention of defendant Chandrasekhar and asked if he could initiate a Peer Review process of this issue, since the Plaintiff had the right to request such a review. On information and belief Chandrasekhar neither investigated nor referred the Plaintiff's complaint to the peer review process. Soon thereafter defendant emailed the Plaintiff's Director that Dr. Mucia had a "litany of complaints against the Plaintiff". However defendant Chandrasekhar did not produce even a single specific instance of any wrongdoing by the Plaintiff, even though he mentioned "a litany of complaints" in his e mail. The Plaintiff perceived this as a retaliation for his complaints against white favoritism and substandard quality of care by Dr. Mucia.

14

31. In response to this email of defendant Chandrasekhar, the Plaintiff was advised to do everything that was not done by Dr. Mucia and other white doctors in the ER and not to question them, not to argue with them, but to do all that is needed whenever any one of them failed to do anything that was necessary.

## VIII. PLAINTIFF'S COMPLAINTS ABOUT RACIAL DFFERENCES.

32. During the five-year tenure of the complainant at the Hospital defendants Chandrasekhar and Fakoory spoke to the Plaintiff approximately about 5 to 6 times. Each time the Plaintiff was told to continue to serve those White specialty doctors because that's how the set up was. The two Agents at different times and separately alluded that it was an old white boys club and as a minority the Plaintiff should serve them without questioning.

33. Plaintiff continued to object to such discriminatory practices at the Hospital and continued to voice his reasonable, genuine and good faith complaints with the Agents of the Hospital. However a time came when, frustrated by this behavior of the Hospital, he felt he could not continue to serve there anymore, felt compelled to resign and ultimately tendered his

15

resignation to his sponsor during the middle of 2017, so that additionally, his sponsor, the Benchmark would not be embarrassed by the Plaintiff's complaining behavior either. However his resignation was rejected.

## IX. TERMINATION OF PLAINTIFF'S SERVICE

34. On or about September 24, 2018 the Plaintiff received a phone call by the Benchmark director to tell him that there was "good news" for him that they found a replacement for him and that there was no need for his services from November 1, 2018.

35. During that phone call the Plaintiff realizing that it was just a short 5 week notice he requested if he could stay on till December 31, 2018. However his request was not honored.

36. On information and belief the termination of the Plaintiff's service, that too with a short notice, was done at the behest of Chandrasekhar who had insisted that the Plaintiff should be removed from the Hospital as soon as possible, obviously as a Retaliation for Plaintiff's opposition to Racially charged work atmosphere.

37. Since his discharge from the Hospital on or about November 01, 2018, the Plaintiff has not been able to gain employment to his full potential at the level that he was gainfully employed before November 1, 2018. As a result he has suffered mental anguish, humiliation and financial loss and therefore seeks financial compensation though this action.

## X. TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP.

38. The defendants were fully aware of the contractual relationship the Plaintiff had with Benchmark. As a matter of fact, it is Benchmark who introduced the plaintiff to the defendant hospital and recommended that the Plaintiff be granted privileges so that the Plaintiff could work for Benchmark at the defendant Hospital. Additionally, defendant Chandrasekhar had complained numerous times, in order to modify the professional behavior of the plaintiff, to the Plaintiff's supervisor, who was the Director of Benchmark at the defendant Hospital. It is abundantly clear that defendants complained to Benchmark through its Hospitalists' Director and other executives only because of their knowledge about the contractual relationship of the Plaintiff with Benchmark. Moreover, the relationship between the Plaintiff (and similarly situated Physicians) and Benchmark was evident during the regularly scheduled monthly meetings attended by the defendant Chandrasekhar and Benchmark

representatives.  Additionally, day today work of Benchmark Hospitalists at the defendant Hospital was mostly supervised, managed and modified by defendant Chandrasekhar through the Benchmark management only. Thus, the defendants knew about the existence of a contract between the Plaintiff and Benchmark.

39. The defendants Chandrasekhar and Fakoory kept constant pressure on the management of Benchmark on an ongoing basis, through their complaints to Benchmark, in order to cause a breach of the contractual relationship of the plaintiff with Benchmark, as retaliation for the Plaintiff's complaints of racial discrimination.

40. The sole intention of the defendants' complaints to Benchmark agents was to disrupt the performance of the said contract between Plaintiff and Benchmark and knew that such a disruption of performance was certain to occur as a result of their complaints.

41. Thus, the defendant Hospital, Chandrasekhar and Fakoory, all intentionally interfered with the contractual relationship which the plaintiff had with Benchmark.

42. The defendants' conduct therefore, prevented the performance of the plaintiff's relationship with Benchmark because of the numerous complaints that the defendants lodged with the Benchmark Management.

43. The intentional acts of the defendants were designed to cause a breach of the contract that the plaintiff had with Benchmark in order to work at Defendant Hospital.

44. Thus a breach of contract was directly caused by the defendants' unlawful conduct.

45. Critically, the defendants' unlawful conduct with resultant breach of contract was the proximal cause of financial loss and emotional injury that the Plaintiff suffered after November 2108.

## XI. EXHAUSTION OF FEDERAL ADMINISTRATIVE REMEDIES

46. It is Plaintiff' best recollection that he filed a charge with the Equal Employment Opportunity Commission  regarding the Defendant's alleged discriminatory conduct and the Equal Employment Opportunity Commission has issued a Notice of Right to Sue letter on October 2019.  A copy of that letter is being appended as Exhibit "A".

## XII. CAUSATION AND PROXIMITY.

47. As a proximate result of Defendants' illegal acts towards the Plaintiff, Plaintiff will suffer a loss of earnings and other employment benefits.

48. As a proximate result of Defendants' illegal acts towards the Plaintiff, Plaintiff has suffered impairment and damage to Plaintiff's good name and reputation.

49. As a proximate result of Defendants' illegal acts towards the Plaintiff, Plaintiff has suffered mental anguish and emotional injury.

50. As a proximate result of Defendants' illegal acts towards the Plaintiff, Plaintiff has been unable to find compatible and comparable employment and as result, continues to suffer significant economic losses.

51. Defendants' actions were willful, outrageous and malicious and were done with reckless indifference to Plaintiff's protected rights, entitling Plaintiff to punitive and/or liquidated damages.

## XIII. CAUSES OF ACTION

FIRST CAUSE OF ACTION

52. Plaintiff hereby repeats and re alleges each allegation contained in each numbered paragraph above.

53. By discriminating against Plaintiff on the basis of his race and by subjecting him to retaliatory measures because he complained about such discrimination, Defendants violated U.S. Code Title 42 Sections 1981 and 2000 (e)-2, 2000(e)-3.

SECOND CAUSE OF ACTION.

54. By complaining unjustifiably and in an ongoing basis to Benchmark against the Plaintiff and pressurizing Benchmark to remove the Plaintiff from the Hospital, the defendants violated the California's Common Law against Tortious Interference with Existing Business (Economic) Relationships.

## XIII. PRAYER FOR RELIEF

55. WHEREFORE, Plaintiff prays that this Court grant judgment to him granting the following relief

a. An award of Plaintiff's actual damages in an amount to be determined at trial for loss of wages and an award of front pay compensating the Plaintiff for loss of future earnings,

b. An award of damages to be determined at trial to compensate Plaintiff for mental anguish, humiliation, embarrassment and emotional injury,

c. An award of reasonable attorney's fees and the costs of this action, if and as and when Plaintiff utilizes the services of an attorney for litigating this lawsuit,

d. An immediate Injunction against the Defendants refraining them from continuation of their current practice of admitting Surgical patients to Internists (specialized in Internal Medicine) so that the Patients' health and safety are protected and most importantly, the patients receive the standard of care owed to them by the appropriate specialist.

e. Such other and further relief as this Court may deem just and proper.

Respectfully submitted,                    Dated.  January 22, 2020

SATISH DESHPANDE, Pro Se

28 NELSON ROAD

SCARSDALE, NY 10583

Email:   Gentlemanof2006@gmail.com

Phone:   9148444740

Attachment:  Exhibit "A" Letter of Right to Sue by EEOC.

EXHIBIT "A"

UAL EMPLOYMENT OPPORTUNITY COMMISSION
255 E. Temple Street, 4th Floor
Los Angeles, CA 90012

OFFICIAL BUSINESS
PENALTY FOR PRIVATE USE $300



U.S. POSTAGE ≫ PITNEY BOWES

ZIP 35205 $ 000.50⁰
02 4W
0000361441 OCT. 29 2019

Recieved
Oct 31, 2019.

105B385716 C325

EEOC Form 161 (11/16)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

Rec'd 10/31/2019.

## DISMISSAL AND NOTICE OF RIGHTS

| | |
|---|---|
| To: **Satish Deshpande**<br>**28 Nelson Road**<br>**Scarsdale, NY 10583** | From: **Los Angeles District Office**<br>**255 E. Temple St. 4th Floor**<br>**Los Angeles, CA 90012** |

☐ On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2019-04981** | **Jake B. DeMarco,**<br>**Investigator** | **(213) 894-6573** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

**Rosa M. Viramontes,**
**District Director**

10/28/2019
(Date Mailed)

Enclosures(s)

cc: **John Peeples, PhD**
**Human Resources Executive**
**METHODIST HOSPITAL OF SOUTHERN CALIFORNIA**
**300 W. Huntington Drive**
**Arcadia, CA 91007**

Enclosure with EEOC
Form 161 (11/16)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS    --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),
the Genetic Information Nondiscrimination Act (GINA), or the Age
Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within
90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-
day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to
consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell
him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely
manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as
indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate
State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide
after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short
statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of
your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the
charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include
any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters
alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in
some cases can be brought where relevant employment records are kept, where the employment would have
been, or where the respondent has its main office. If you have simple questions, you usually can get answers from
the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint
or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS    --    Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back
pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For
example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit
before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA
suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.
Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA
claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION    --    Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction
in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be
made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your
efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above,
because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any
questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to
inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide
your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files
are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge
file, **please make your review request within 6 months of this Notice**. (Before filing suit, any request should be
made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*